IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

01 MAY 31  PM 4: 41

. . . . . . . . . . . . COURT
H.D. OF ALABAMA

ETTA CHEATOM,                    )
                                 )
          Plaintiff,             )
                                 )
v.                               )     CASE NO: CV-99-B-3271-NW
                                 )
(RUDY FARMS) JIMMY DEAN FOODS,   )
                                 )     ENTERED
          Defendant.             )
                                       JUN - 1 2001

## MEMORANDUM OPINION

Currently before the court are Defendant's Motion for Summary Judgment and

Defendant's Motion to Strike Plaintiff's Untimely Response to Defendant's Summary Judgment

Motion, filed by defendant Jimmy Dean Foods ("defendant" or "Jimmy Dean"). Etta Cheatom,

("plaintiff" or "Cheatom") filed suit under Title VII of the Civil Rights Act of 1964, as amended,

42 U.S.C, § 2000e *et seq.*, alleging that she was denied several promotions because of her race

(black) and sex (female).[1] Upon consideration of the record, the submission of the parties, the

arguments of counsel, and the relevant law, the court is of the opinion that both of defendants'

motions are due to be granted.

## I.    FACTUAL SUMMARY

**A.    Background Facts**

Jimmy Dean makes various sausage, breakfast and luncheon products. Plaintiff began

working at Jimmy Dean in 1987, through a temporary employment agency. (DX 1 at 26, 28.)[2]

---

[1] Although plaintiff also loosely used the term "retaliation" in her Complaint, it does not
appear that she intended this to be a separate independent claim, and, as later discussed, the court
does not recognize it as such.

[2] Defendant filed its Evidentiary Materials in Support of Defendant's Motion for
Summary Judgment on October 2, 2000. This evidence will be referred to as "DX," followed by
the corresponding tab number.



*31*

She became a regular employee of Jimmy Dean in late 1989. (*Id.* at 26-27.) She worked as an hourly production worker at that time. (*Id.*)

Most of the jobs to which plaintiff claims she was denied promotion were production supervisor positions. At Jimmy Dean, production supervisors oversee the running of various production lines and supervise the employees on those lines. (DX 2 at 6-7.) Prior to 1999, lead persons assisted the supervisors in making sure that the production lines ran smoothly.[3] (*Id.* at 8.) The lead person job was an hourly position. (DX 1 at 94-95.) Plaintiff testified that, during the relevant time period, internal promotions to production supervisor positions were made from the pool of current lead persons. (DX 1 at 65-66; 108-10.) Plaintiff did not have any prior experience in supervision or as a lead person. (*Id.* at 28-33.)

## B.   Inquiries Regarding Management Jobs in 1990 and 1992

In 1990, plaintiff spoke with Pat Burney ("Burney"), a female who worked in the Human Resources Department, and inquired about moving into a managerial position. (DX 1 at 12-15.) Burney told plaintiff that there were no managerial vacancies at that time. (*Id.* at 14-15.) Plaintiff did not fill out any form or application at this time. (*Id.* at 16.)

In 1992, plaintiff asked Connie Mason Beavis White ("White"), a secretary in the human resources department if there were any management jobs available. (DX 1 at 16-17.) White told plaintiff there were no managerial vacancies at that time, (*id.* at 15-17), and plaintiff was not aware of any vacant managerial or supervisory positions at that time, (*id.* at 18).

---

the corresponding tab number.

[3] Lead person positions were eliminated in 1999. (*See* DX 2 at 8, 31-32.)

### C.   Supervisor Job Filled in January 1994

In January 1994, Jimmy Dean began running a new production line. (DX 1 at 33-34.) Dianna Morris ("Morris"), a white female, was promoted from a lead person position to the position of supervisor over the new production line. (DX 1 at 33-35, 37; DX 3 at ¶ 2 and Ex. A attached thereto.) Morris had been working as a lead person since August 1993. (DX 1 at 34-35; DX 3 at ¶ 2 and Ex. A attached thereto.) Plaintiff was not a lead person at that time.[4] (See DX 1 at 92.) At least by early February 1994, plaintiff knew that Morris had been promoted to the supervisor position. (DX 1 at 37-39.) Plaintiff believed at that time that she had been discriminated against because of her race. (Id. at 38.)

### D.   Plaintiff Promoted to Barcode Operator in March 1995

In March 1995, plaintiff was promoted from a production worker position (biscuit assembler) to a barcode operator. (DX 1 at 49 and Ex. 6 attached thereto.) As a barcode operator, she ensured that the correct products and correct amount of products were being received or shipped. (Id. at 51-52; see also id. at 55-57.) She was the only barcode operator on the day shift, and she did not supervise any other employees. (Id. at 53, 58.)

### E.   Supervisor Job Filled in August 1996

In August 1996, Dale Landers ("Landers"), a white female, was promoted from a lead person position to a production supervisor position. (DX 1 at 60-61 and Ex. 7 attached thereto.) Landers had been a lead person for approximately two and a half years prior to her promotion to supervisor. (DX 1 at 60-61; DX 3 at ¶ 3.) Plaintiff knew of Landers's promotion to production supervisor around the time that it occurred. (DX 1 at 61.) At the time Landers was promoted,

---

[4] Plaintiff first became a lead person in October 1997. (DX 1 at 92.)

plaintiff believed that she had been discriminated against on account of her race because she did not receive the promotion.  (*Id.* at 62-63.)

**F.      Quality Assurance Inspector Jobs, 1996 and 1997**

Jimmy Dean has a Quality Assurance Department, separate from the various production departments, whose employees conduct more detailed inspections of equipment and analyze raw materials and finished products.  Plaintiff contends that she applied for a quality assurance inspector position around October of 1996.  (*Id.* at 70-71.)  Gabriel Oates ("Oates"), a black male, was selected for the quality assurance inspector position around November of 1996.  (*Id.* at 73-75; DX 3 at ¶ 4.)  Plaintiff knew in 1996 that Oates had been selected for the position.  (DX 1 at 74-75.)

In April 1997, plaintiff learned that there was another vacancy for a quality assurance inspector position.  (DX 1 at 76-77.)  She submitted an application for the position.  (*Id.* at 76-77, 81.)  Crystal Pride ("Pride"), a black female was selected for this position in April 1997.  (*Id.* at 77-78; DX 3 at ¶ 4.)  Carmen Cooper ("Cooper"), also a black female, was selected for a quality assurance inspector position in July 1997.  (DX 1 at 79-80; DX 3 at ¶ 4.)  Plaintiff testified that she believed she was not selected in 1996 and 1997 for the quality assurance inspector positions because of her educational level.  (DX 1 at 83-85.)

**G.      Plaintiff Promoted to Lead Person on Night Shift in October 1997**

In late 1997, plaintiff applied for a promotion to a lead person position.  (DX 1 at 85.) Jimmy Dean's procedure at that time was that anyone becoming a lead person had to start on the night shift.  (*Id.* at 85-86, 90, 167-68; DX 2 at 10-11, 35.)  Jimmy Dean would provide any necessary lead training on the night shift.  (*See id.*)  When a lead person position subsequently became available on the day shift, the employees working lead positions on the night shift could then request to fill the vacancy.  (DX 2 at 10-11.)  Plaintiff did not want to work on the night

4

shift, but nevertheless applied for the lead person position because she did not believe that she would be required to work on the night shift for more than about three months. (DX 1 at 112-13, 136-37.)

Plaintiff received the promotion, and on October 6, 1997, became a lead person for the "Cooker 3 Line" on the night shift. (DX 1 at 92-93.) She received training on various procedures and paperwork requirements. (*Id.* at 93-94.) As a lead person, plaintiff received a pay raise (on an hourly basis) and began receiving extra compensation (more gain sharing checks). (*Id.* at 94-96.)

**H.     Day Shift Lead Person Position Filled**

Prior to October 1997, Mike Elliot ("Elliott"), a white male, was a lead person on the night shift, specifically, on a particular sausage line called "Cooker 3." (DX 1 at 96-97.) Prior to plaintiff's promotion to lead person, Jimmy Dean selected Elliot to fill a vacancy in a lead person position on the day shift. (*Id.* at 99-100.) Plaintiff was then promoted to the night shift lead person position on Cooker 3, a position previously held by Elliot. (*Id.* at 93, 97.) On October 13, 1997, about a week after plaintiff began working on the night shift, Elliot began his day shift lead person duties. (*Id.* at 97-98.)

Plaintiff immediately knew of Elliot's transfer to the day shift. (*Id.* at 99-100.) She believed at that time that she had been discriminated against because of her sex and race by not being allowed to transfer to the position for which Elliot was selected. (*Id.* at 100.) About a day after Elliot began working on the day shift (i.e., about October 14, 1997), plaintiff complained to Human Resources Manager David Jones ("Jones") because she believed that she should have been transferred to the day shift instead of Elliot. (*Id.* at 99-100.) Plaintiff testified that after checking with the superintendents over the production areas, Jones explained to plaintiff that the

5

decision to transfer Elliot to the day shift position was made prior to plaintiff's promotion to the lead person job on the night shift. (*Id.* at 100-02.)

**I.      Night Shift Supervisor Job Filled October 13, 1997**

In the fall of 1997, Jimmy Dean promoted Charlotte Hatton ("Hatton"), a white female, from a night shift lead person position to a night shift production supervisor position. (DX 1 at 107-08, 111-12; DX 3 at ¶ 5.) She began her night shift supervisor duties on October 13, 1997. (DX 1 at 111-12; DX 3 at ¶ 5.) At the time Hatton became a supervisor, she had been working as a lead person on the night shift since December 1996, (*id.*), whereas plaintiff had just become a lead person a few days before and was receiving training, (DX 1 at 92-94). Plaintiff knew of Hatton's promotion to supervisor around the time that it occurred[5] and believed at that time that she had been discriminated against because of her race. (*Id.* at 116-18.)

**J.      Return to Day Shift Position**

In April 1998, plaintiff was still working as a lead person on the night shift. At the time plaintiff was promoted to this position, she did not want to work on the night shift, and she believed that she would be able to return to the day shift within a few months of receiving the promotion. (DX 1 at 112-13, 115, 136-37.) Plaintiff was anxious to return to the day shift in order to spend more time with her daughter who was not doing well in school. (*Id.* at a112-15, 127-28.) However, between October 14, 1997, and April 20, 1998, no day shift lead positions were filled with new lead persons. (*Id.* at 119, 127.) Thus, the only way an employee could move from the night shift to the day shift was to give up their lead position. (*Id.* at 127.) When plaintiff inquired as to whether she would be able to return to the day shift, Jones told her that she could return to an hourly production position, but that no day shift lead person position was

---

[5] Plaintiff stated that she learned of the promotion "probably in the same month or something like that" in which it occurred. (DX 1 at 117.)

vacant at that time. (*Id.* at 127-28.)  Plaintiff could have remained in her position as a lead person on the night shift, but on April 20, 1998, she chose to resign her lead person position so that she could immediately return to the day shift and spend more time with her daughter. (*Id.* at 127-29.)

The policy at Jimmy Dean was such that anyone selected for a day shift lead person position after April 1998, would have been selected from the group of night shift lead persons at that particular time. (DX 1 at 85-86, 90, 167-68; DX 2 at 10-11, 35.)  Jimmy Dean eliminated the lead person positions in 1999. (DX 2 at 31-32, 39.)

## K.   Plaintiff's EEOC Charge and Complaint

Plaintiff filed a Charge of Discrimination with the EEOC on October 15, 1998, in which she alleged:

> I believe that I was denied a transfer and a promotion in violation of Title VII of the Civil Rights Act of 1964, as amended.  I believe that my employer could have promoted and transferred me to the day shift as a leadperson [sic] if seniority had been applied correctly.  I have more seniority than two or more of the male employees selected for promotion to the day shift.  I have applied for lead and supervisory positions and observed my employer promote White and male employees to these positions who did not finish high school.  I have a B.S. Degree in Management.  I believe that three or more male employees were advised to transfer to the night shift and that they were promoted to a lead position within a three week to three month period of time.  I was denied the opportunities extended to Whites and male employees.

(DX 1 at 22-23 and Ex. 2 attached thereto.)  The EEOC dismissed the Charge and issued a Notice of Right to Sue.  (DX 1 at 24.)

Plaintiff's Complaint states that plaintiff received the Right to Sue Notice about September 9, 1999.  (Compl. at ¶ 29B.)  When first asked in her deposition whether she received the EEOC Notice by September 9, 1999, plaintiff answered, "yes, I think." (DX 1 at 24.) Although she later stated in her deposition that she could not remember the exact date she received the Notice, (*id.*), she acknowledged that the envelope in which she received the Notice

7

indicated that it was received on September 9, 1999. (*Id.*; *see also* DX 4.) In Plaintiff's

Response to Defendant's Motion for Summary Judgment, plaintiff indicated that Phyliss Carter

("Carter") received and signed for the Notice and that she did not actually see it until September

11, 1999. (*See* Plaintiff's Response to Defendant's Motion for Summary Judgment ("Pl.'s Br.")

at ¶ 5.) Plaintiff filed her Complaint on December 9, 1999, ninety-one days after the EEOC

Notice of Right to Sue was received on September 9, 1999.

## II.   <u>DEFENDANT'S MOTION TO STRIKE</u>

Consistent with the court's Scheduling Order, Jimmy Dean filed Defendant's Motion for

Summary Judgment and supporting evidentiary materials on October 2, 2000. (*See* Scheduling

Order entered April 10, 2000, at ¶ 10.) In the Scheduling Order, the court ordered plaintiff to file

her evidentiary materials in opposition to defendant's Motion for Summary Judgment and to

submit her brief in opposition to such motion within twenty-one days after the filing of the

Motion for Summary Judgment. (*See id.* at ¶ 10 and Ex. A attached thereto.) Thus, plaintiff's

evidentiary materials and brief in opposition were due by October 23, 2000. The court also

ordered plaintiff not to delay service of copies of her summary judgment materials. (*See id.*)[6]

Cheatom did not file or submit her brief in opposition to defendant's Motion for

Summary Judgment and supporting evidentiary materials to the court until November 1, 2000,

---

[6] Specifically, the Summary Judgment Scheduling Order provides:

> The parties shall transmit their submissions in such a manner that their opponents
> will not suffer any undue delay in the receipt of their service copies of any
> submission. Counsel are expected to take care that service of copies is not
> delayed. . . . Every effort should be made by the movant for the opposing party to
> receive a copy of all materials **on the date** the submission is made to the court. In
> any event, the movant is **required** to insure that the opposing party receive a copy
> of all submitted materials **no later than** one day after submission is made to the
> court.

(Scheduling Order at Ex. A ¶ A3 and n.2) (emphasis in original.)

nine days after the court-ordered deadline.  Although the certificate of service attached to plaintiff's brief indicated that the brief was served on defendant's counsel on October 26, 2000, the stamp on the envelope in which the brief was served on defendant's counsel indicates that the brief was not actually mailed until October 31, 2000, eight days after the court-ordered deadline. (*See* Ex. 1 and Ex. A attached to Defendant's Motion to Strike Plaintiff's Untimely Response to Defendant's Summary Judgment Motion.)

Despite these date discrepancies, plaintiff argues that she "filed all documents relevant to the instant case in a timely manner." (Pl.'s Br. at ¶ 1.)  However, at oral argument, plaintiff's counsel essentially stated that she had no excuse for failing to file her response on time and she could not explain why the entry in the service date stated October 26, 2000, but the envelope showed that it was mailed out on October 31, 2000.

In sum, the evidence before the court establishes that plaintiff's evidentiary materials and plaintiff's brief were untimely filed with the court and untimely served on defendant's counsel. Accordingly, Defendant's Motion to Strike Plaintiff's Response is due to be granted.

### III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

9

In deciding a motion for summary judgement, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV.   DISCUSSION

### A.   Plaintiff's Complaint Was Untimely Filed

Title VII requires a plaintiff to file her lawsuit within ninety days after the Right to Sue Notice from the EEOC is received. 42 U.S.C. § 2000e-5(f)(1) (Complaint must be filed "within ninety days after the giving of such notice"). A Complaint is barred as untimely if it is not filed within the ninety days. Even a Complaint filed on the ninety-first day after receipt of the EEOC Right to Sue Notice is barred as untimely. *Norris v. Florida Dep't of Health and Rehabilitative Services*, 730 F.2d 682, 682-83 (11th Cir. 1984) (summary judgment properly granted where Complaint filed ninety-one days after plaintiff received Right to Sue Notice).[7]

As noted above, in Plaintiff's Response to Defendant's Motion for Summary Judgment, plaintiff indicated that Phyliss Carter ("Carter") received and signed for the Notice and that plaintiff did not actually see it until September 11, 1999. (*See* Pl.'s Br. at ¶¶ 5-6 and Affidavit of Cheatom attached thereto.) As explained above, Plaintiff's Response to Defendant's Motion for

---

[7] *Accord, Mosel v. Hills Dep't Store, Inc.*, 789 F.2d 251, 253 (3rd Cir. 1986) ("While the 90-day rule is not a jurisdictional predicate, in the absence of a recognized equitable consideration, the court cannot extend the limitations period by even one day.") (citation and internal quotation marks omitted); *Prophet v. Armco Steel, Inc.*, 575 F.2d 579, 580 (5th Cir. 1978) (case dismissed when action filed ninety-two days after EEOC notice was received).

Summary Judgment is due to be stricken because it was untimely. Moreover, a plaintiff cannot create a genuine issue of material fact or avoid summary judgment by contradicting prior pleadings and testimony. *See, e.g., Van T. Junkins and Associates, Inc. v. Industries, Inc.*, 736 F.2d 656, 658-59 (11th Cir. 1984) (A "court may find an affidavit which contradicts testimony on deposition a sham when the party merely contradicts its prior testimony without giving any valid explanation.").[8] However, even if the court were to consider plaintiff's affidavit, it is not material whether plaintiff actually saw the EEOC Notice on September 9, 1999, or September 11, 1999. The undisputed fact is that the EEOC Notice was received and accepted at the address plaintiff provided to the EEOC on September 9, 1999. (*See* DX 4.) Regardless of whether plaintiff herself picked up her mail or someone picked it up for her, Title VII's limitations period began to run on September 9, 1999. *See Law v. Hercules, Inc.*, 713 F.2d 691, 692-93 (11th Cir. 1983) (ninety-day period began when claimant's son signed return receipt for EEOC right-to-sue letter even though claimant did not see the letter until one or two days later).[9]

---

[8] As noted above, plaintiff first stated that she received the EEOC notice on September 9, 1999, and then later claimed that she did not receive it until September 11, 1999.

[9] *Accord, Scholar v. Pacific Bell*, 963 F.2d 264, 268 (9th Cir. 1992) (ninety-day period began to run when EEOC notice was received at claimant's house and signed for by her daughter, even though the claimant did not personally see the letter until a few days later); *Harvey v. New Bern Police Dep't*, 813 F.2d 652, 653-54 (4th Cir. 1987) (ninety-day period began when EEOC's right-to-sue letter was received by claimant's wife even though claimant did not learn of letter until six days later); *Espinoza v. Missouri Pacific R.R. Co.*, 754 F.2d 1247, 1248-50 (5th Cir. 1985) (ninety-day period began when EEOC's right-to-sue letter was received by claimant's wife even though claimant did not learn about the letter until he returned from out of town eight days later); *Roberson v. Bowie State Univ.*, 899 F. Supp. 235, 238-239 n.2 (D. Md. 1995) (complaint dismissed for being one day late because ninety-day period began to run when the plaintiff's daughter signed for the EEOC notice, not when the plaintiff personally opened the notice more than two weeks later).

Plaintiff failed to file her Complaint within ninety days of the receipt of the Notice of Right to Sue from the EEOC.[10]  Therefore, plaintiff's entire Complaint is time-barred.

**B.**     **Failure to File EEOC Charge Within 180 Days of the Alleged Discrimination**

Title VII requires a would-be plaintiff to file a Charge of Discrimination with the EEOC within 180 days of the alleged discriminatory act.  42 U.S.C. §2000e-5(e)(1).  The Supreme Court has held that the 180-day period for filing a charge of discrimination is intended to operate as a statute of limitations.  *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393-94 (1982) ("We hold that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.").  Unless equity requires that the 180-day requirement be waived or tolled, an individual who fails to file a charge of discrimination within the 180-day period is prohibited from pursuing a civil action under Title VII to redress the alleged unlawful employment practice.  *Buffington v. General Time Corp.,* 677 F. Supp. 1186, 1190 (M.D. Ga. 1988) (citing *Zipes,* 455 U.S. at 393-94).

To the extent that plaintiff claims that her transfer to the day shift on April 20, 1998, was discriminatory, that particular event would not be barred by the 180-day limitations period. Plaintiff, however, did not timely file her EEOC Charge with respect to her other claims.[11]  As

---

[10]  As noted above, plaintiff filed her Complaint on December 9, 1999, ninety-one days after the EEOC notice was received on September 9, 1999.

[11]  Plaintiff alleges:

Plaintiff is asserting that the final act is the basis of her EEOC complaint and this instant case resulted from the previous acts of discrimination which in addition to being discriminatory on its face was also discriminatory in practice since the continued failure to promote or allow Plaintiff to be promoted, kept her [from] receiving many of the necessary skills and experience in management or supervisory capacities which would make her eligible for other management positions.

shown below, years passed between the alleged discriminatory events (i.e., denied promotions) and the date on which plaintiff filed an EEOC Charge:

| Alleged Discriminatory Event | Time Between Event and Filing of Charge |
|---|---|
| * 1990 and 1992 Inquiries | More than five and a half years |
| * Supervisor Position Filled in January 1994 | Approximately four years and nine months |
| * Supervisor Position Filled in August 1996 | Approximately two years and two months |
| * Quality Assurance Inspector Positions Filled in 1996 and 1997 | More than one year |
| * Mike Elliot's October 1997 Transfer to day shift | One year |
| * Night Shift Supervisor Position Filled in October 1997 | One year |

Plaintiff admittedly knew of the alleged discriminatory promotions and transfers at the times they occurred years ago and believed on those occasions that she was the victim of discrimination.  (DX 1 at 37-39, 62-63, 83-85, 99-100, 116-18.)  Yet she did not file an EEOC

---

(Pl.'s Br. at ¶ 4.)

Plaintiff cannot prevail on her theory that the events which occurred outside the 180-day limitations period were a "continuing violation."  Plaintiff admittedly knew of the events and believed them to be discriminatory at the times they occurred.  It is exactly this type of case which the limitations period was designed to bar.  *See Roberts v. Gadsden Memorial Hospital*, 835 F.2d 793, *modified*, 850 F.2d 1549, 1550 (11th Cir. 1988) ("[E]ven if we assume that the 1978 discriminatory act continued into the statutory filing period, we must still conclude that [the plaintiff's] claim based on that incident is time-barred. [The plaintiff] admitted that he was aware of his rights in 1978. He could have asserted them at that time. To the extent that [the defendant] injured him on a continuing basis as a result of the 1978 incident, it was only because he knowingly failed to exercise his rights.  A claim arising out of an injury which is 'continuing' only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the 180-day limitation period.").

Charge until October 15, 1998, which was a year to several years after the alleged discrimination. (*Id.* at 22-23 and Ex. 2 attached thereto.) Further, plaintiff has failed to provide the court with any evidence demonstrating that the doctrines of waiver, estoppel, or equitable tolling might apply under the facts of this case. Because plaintiff did not file her EEOC Charge within 180 days of the allegedly discriminatory acts described above, the claims regarding those acts are time-barred.

## C.   Title VII Claims

Even if the court were to consider Plaintiff's Response to Defendant's Motion for Summary Judgment, defendant would still be entitled to judgment as a matter of law on all of plaintiff's claims. Plaintiff claims that "[t]hroughout her employment, defendant has subjected [her] to discriminatory terms and conditions of employment and retaliated[12] against her based upon her race, African American," and "defendant intentionally discriminated against and retaliated against plaintiff on the basis of her race, African-American and gender, female."

---

[12] Although plaintiff loosely used the term "retaliation" in her Complaint, it does not appear that she intended this to be a separate and independent claim, and the court does not recognize it as such. Plaintiff did not refer to any retaliatory conduct in her EEOC Charge, nor did she list retaliation as a separate claim in her Complaint. Further, she did not identify any "protected activity" in which she engaged and which would precipitate retaliation.

Moreover, any claim for retaliation would be time-barred because plaintiff failed to timely file her Complaint as well as her EEOC Charge. Further, even if any claim of retaliation was not time-barred, plaintiff cannot establish a prima facie case of retaliation. To establish a prima facie case, a plaintiff must prove that she engaged in statutorily protected activity, she was subjected to an adverse employment action, and there was a causal link between her protected activity and the adverse employment action. *Canino v. United States Equal Employment Opportunity Commission*, 707 F.2d 468, 471 (11th Cir. 1983). The promotions to which plaintiff claims she was denied occurred between 1990 and October of 1997. The only "protected activity" alluded to by plaintiff is the filing of her EEOC Charge, which occurred on October 15, 1998. Because the protected activity occurred *after* the allegedly discriminatory employment actions, these actions could not have been in retaliation for the filing of her EEOC Charge. Thus, there is no evidence of a causal link between the protected conduct and an adverse employment action.

(Compl. at ¶¶ 9, 27.) Further, plaintiff contends that "[s]ince 1989,[13] [she] has applied for a total of eight (8) supervisory/management positions and she was not considered or given an interview for any of those positions." (*Id.* at ¶ 10.) Even if plaintiff's claims were not time-barred, they would still fail as a matter of law. In any action alleging disparate treatment by an employer, the plaintiff must prove that the employer acted with a discriminatory motive. *See International Board of Teamsters v. United States,* 431 U.S. 324, 335 n.15 (1977) (As to disparate treatment discrimination, "[p]roof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment."). To establish a prima facie case of discrimination, a plaintiff may employ direct evidence of discriminatory intent, statistical proof of a pattern of discrimination, or circumstantial evidence. *See Verbraeken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045 (11th Cir. 1989). The evaluation of a plaintiff's evidence of the employer's intent differs, depending upon whether the plaintiff's proof is direct or circumstantial in nature.

In the present case, there is no direct evidence to support plaintiff's claims of discrimination. Thus, plaintiff must rely on circumstantial evidence to support her claims. Because plaintiff is relying on circumstantial evidence to support her claims, the court is governed by the familiar, tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir. 1997) (clarifying the standard to be applied under Eleventh Circuit

---

[13] The evidence before the court establishes that plaintiff first inquired about a management position in 1990. (*See* DX 1 at 12.)

jurisprudence).  Under this framework, the plaintiff bears the initial burden of establishing a

prima facie case of discrimination.  *Burdine*, 450 U.S. at 252-53.[14]

      If the plaintiff successfully establishes a prima facie case, the burden of production shifts

to the defendant "to articulate a legitimate, nondiscriminatory reason" for the employment action.

*McDonnell Douglas*, 411 U.S. at 802.  Defendant's burden to rebut the presumption created in

such a situation is one of production rather than proof, requiring defendant to articulate a

legitimate, nondiscriminatory reason for its action.  *Burdine*, 450 U.S. at 257-58.  In satisfying

this burden:

> [t]he employer's burden of rebuttal is "exceedingly light."  Since the rebuttal
> burden is one of production only, the employer "need not persuade the court that it
> was actually motivated by the proffered reasons . . . .  It is sufficient if the
> [employer's] evidence raises a genuine issue of fact as to whether it discriminated
> against the [employee]."

*Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1495 (11th Cir. 1989) (quoting

*Burdine*, 450 U.S. at 254-55) (alterations in original).

      If the defendant succeeds in carrying this burden, then any "presumption of

discrimination created by the *McDonnell Douglas* framework drops from the case, and the

factual inquiry proceeds to a new level of specificity."  *Combs*, 106 F.3d at 1528 (quotation

omitted).  The plaintiff must then prove that the defendant's articulated reasons are a mere

pretext for unlawful motives (i.e., discrimination or retaliation).  *Id.*  A plaintiff's prima facie

case coupled with sufficient evidence to allow a fact finder to disbelieve the employer's proffered

explanation for its actions is enough to preclude entry of judgment as a matter of law.  *See id.* at

1529; *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207 (11th Cir. 1997).  At all times, the plaintiff

---

[14]   "The facts necessarily will vary in Title VII cases, and the specification [] of the
prima facie proof required from [plaintiff] is not necessarily applicable in every respect to
differing factual situations."  *McDonnell Douglas,* 411 U.S. at 802 n.13.

bears the burden of persuasion on the ultimate question of whether the defendant acted with an unlawful motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

To avoid summary judgment, a plaintiff must submit sufficient nonconclusory evidence that defendant's articulated legitimate reasons for the employment decisions were pretextual. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471-72 (11th Cir. 1991); *Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir. 1989). Plaintiff must put forth concrete evidence that casts sufficient doubt on defendant's proffered reasons such that a reasonable fact finder would conclude that those reasons did not actually motivate the employment decisions. *See Combs*, 106 F.3d at 1538; *Earley v. Champion Int'l. Corp.*, 907 F.2d 1077, 1083-84 (11th Cir. 1990).

### 1.    Promotions

As noted above, plaintiff must first establish a prima facie case of race or sex discrimination. To establish a prima facie case of discriminatory failure to promote, plaintiff must prove that: (1) she is a member of a protected class; (2) she was qualified for and applied for the promotion; (3) she was rejected in spite of her qualifications; and (4) the individual who received the promotion is not a member of the protected class and had lesser or equal qualifications. *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 642 (11th Cir. 1998).

#### a.    1990 and 1992 Inquiries

Plaintiff claims that she was discriminated against when she inquired as to the availability of management jobs in 1990 and 1992. (*See* DX 1 at 12-18; *see also* Compl. at ¶ 11.) However, the evidence before the court establishes that there were no managerial vacancies on either occasion. (*See* DX 1 at 14-17.) Plaintiff has not produced any evidence establishing either that there was an available position or that she applied for a position in 1990 and 1992. (*See id.*)

Moreover, having failed to establish that there was a vacant managerial position available at the time of her inquiry, plaintiff cannot establish that any such position was filled by a member of a non-protected class.  Thus, plaintiff has failed to establish a prima facie case of discrimination. *See Green v. School Board*, 25 F.3d 974, 978 (11th Cir. 1994) (holding that the plaintiff "failed to establish a prima facie case because she presented no evidence that the [job] position she sought was actually awarded to a member of a non-protected class.").  Because plaintiff cannot establish a prima facie case, defendant is entitled to judgment as a matter of law as to these claims.

        b.     January 1994 Promotion to a Supervisor Position

Plaintiff contends that defendant discriminated against her in January of 1994, when defendant selected Morris for a vacant supervisory position.[15]  (*See* DX 33-35, 37-39; *see also* Compl. at ¶¶ 11-12.)  Assuming a prima facie case of race discrimination, defendant has asserted a legitimate nondiscriminatory reason for selecting Morris, which plaintiff has failed to rebut.  Defendant contends that "Morris was more qualified for the supervisor job than was Plaintiff due to her lead person experience." (Def.'s Br. at 14.)  Plaintiff has failed to meet her burden of raising a genuine issue of fact with respect to the legitimacy of defendant's articulated reason.

Plaintiff has failed to raise a genuine issue of fact with respect to the legitimacy of defendant's articulated reason for its decision.  The evidence before the court demonstrates that, as of January 1994, plaintiff had no supervisory or lead person experience.  (DX 1 at 92.)  Morris, on the other hand, had more than five months' experience in the lead person position. (*See* DX 1 at 34-35; DX 3 at ¶ 2 and Ex. A attached thereto.)  Where a promotion decision is based on a good faith belief that the best qualified person was selected, the decision should not

---

[15]    The selection of Morris, a female, for the supervisor position is fatal to any claim of sex discrimination.

be second guessed by the court. *See Alexander,* 207 F.3d at 1341; *Simms v. Oklahoma ex rel*
*Dept. of Mental Health and Substance Abuse Services,* 165 F.3d 1321, 1329-30 (10th Cir. 1999).
Courts "are not in the business of adjudging whether employment decisions are prudent or fair.
Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged
employment decision." *Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1361
(11th Cir. 1999). Plaintiff has failed to produce sufficient evidence on which a reasonable juror
could find an actual intent on the part of defendant to discriminate against her on the basis of a
prohibited factor, in this case, race. Therefore, her claim as to this position fails as a matter of
law.

c.     Promotion to Supervisor Position in August 1996

      Plaintiff asserts that defendant discriminated against her when it selected Landers for a
vacant supervisor position in August 1996.[16] (*See* DX 1 at 60-63; *see also* Compl. at ¶ 13.)
Assuming a prima facie case of race discrimination, defendant has articulated a legitimate
nondiscriminatory reason for selecting Landers. Defendant asserts that Landers was chosen
because her qualifications for supervisor were far superior. (Def.'s Br. at 14.)

      Plaintiff has failed to raise a genuine issue of fact with respect to the legitimacy of
defendant's articulated reason for its decision. The evidence demonstrates that, whereas plaintiff
had no experience as a lead person, (*see* DX 1 at 92), Landers had been a lead person for about
two and a half years, (DX 1 at 60-61; DX 3 at ¶ 3). As noted above, where a promotion decision
is based on a good faith belief that the best qualified person was selected, the decision should not
be second guessed by the court. *See Alexander,* 207 F.3d at 1341; *Simms,* 165 F.3d at 1329-30.
Plaintiff has come forward with no evidence of pretext. Thus, there is not sufficient evidence

_____

[16] The selection of Landers, a female, for the supervisor position is fatal to any claim of
sex discrimination.

upon which a reasonable juror could infer that plaintiff was discriminated against based on her race, and defendant is entitled to judgment as a matter of law as to this claim.

      d.     Promotion to Quality Assurance Inspector Position in 1996 and 1997

      Plaintiff alleges that defendant discriminated against her when it failed to promote her to the position of quality assurance inspector in 1996 and 1997. (*See* DX 1 at 70-71, 73-81, 83-85; *see also* Compl. at ¶¶ 14-15.) The court first notes that plaintiff testified in her deposition that she believed she was denied the job because of her educational level, and did not claim that she was denied the position because of her race or sex. (*See* DX 1 at 83-85.) Title VII, however, does not protect plaintiff from discrimination based on her educational level. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1289 (11th Cir. 1999) ("Permissible bases for discrimination include education, experience, and references. Impermissible bases for discrimination, under federal law, include race, sex, and age."). Thus, plaintiff's claims as to these promotions fail as a matter of law.

      In any event, the three persons awarded the quality assurance inspector positions in 1996 and 1997, Oates, Pride, and Cooper, are all the same race as plaintiff. (*See* DX 1 at 74, 77, 80; DX 3 at ¶ 4.) Thus, plaintiff cannot establish a prima facie case of race discrimination. *See Green*, 25 F.3d at 978 (plaintiff "failed to establish a prima facie case because she presented no evidence that the . . . position she sought was actually awarded to a member of a non-protected class"). Further, Pride and Cooper are the same gender as plaintiff. Thus, plaintiff cannot establish a prima facie case of gender discrimination as to the positions for which these two individuals were selected. *See Green*, 25 F.3d at 978. There is not sufficient evidence upon which a reasonable juror could infer that plaintiff was discriminated against based on her gender. Plaintiff has offered no evidence demonstrating a discriminatory motive on the part of defendant.

Her contentions either are not supported by any evidence or, more importantly, do not show discrimination. Thus, defendant is entitled to judgment as a matter of law as to these claims.

e.      Promotion to Night Shift Supervisor Position in October 1997

Plaintiff alleges that she was discriminatorily denied the night shift supervisor position which Hatton received on October 13, 1997.[17] (*See* DX 1 at 107-08, 111-12, 116-18; *see also* Compl. at ¶ 18.) Assuming a prima facie case of race discrimination, defendant has articulated a legitimate nondiscriminatory reason for its decision in that it believed Hatton was more qualified for the position than plaintiff. (Def.'s Br. at 18.)

Plaintiff has not met her burden of raising a genuine issue of fact with respect to the legitimacy of defendant's articulated reason for its decision. Plaintiff has failed to offer any evidence rebutting defendant's reason for the selection. The evidence before the court establishes that, at the time the position was filled, Hatton had more than nine months' experience as a lead person. (DX 3 at ¶ 5.) Plaintiff, on the other hand, had been a lead person for only one week and, in fact, was still being trained.[18] (DX 1 at 92-94.) Thus, there is not sufficient evidence upon which a reasonable juror could infer that plaintiff was discriminated against based on her race, and defendant is entitled to judgment as a matter of law as to this claim as well.

2.      *Transfers*

Plaintiff alleges that she was discriminated against in October 1997, when Elliott was transferred from a lead person position on the night shift to a lead person position on the day

---

[17] The fact that the supervisor job was awarded to Hatton, a female, is fatal to any claim of sex discrimination.

[18] Moreover, it is duplicitous for plaintiff to argue she should have been given this job on the night shift when she admittedly did not want to work on the night shift and, in fact, was later willing to give up her lead position to return to the day shift.

21

shift, and again when she was transferred from a lead person position on the night shift to an

hourly production position on the day shift. To establish a prima facie case of disparate

treatment based on circumstantial evidence, under the familiar *McDonnell-Douglas* framework,

plaintiff must show (1) that she is a member of a protected class; (2) that she was subjected to an

adverse employment action, i.e., that she was denied a transfer or forced to transfer; (3) that her

employer treated similarly situated employees outside the protected class more favorably; and (4)

that she was qualified for the position. *See Clermont v. Frenchman's Creek Country Club,* 2001

WL 273144, at *5 (S.D. Fla. Jan. 18, 2001) (citing *Maniccia v. Brown*, 171 F.3d 1364 (11th Cir.

1994) *and Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997)); *see also Smith v. Alabama*

*Department of Public Safety,* 64 F. Supp. 2d 1215, 1221, 1224 (M.D. Ala. 1999) *and Hodges v.*

*Stone Savannah River Pulp and Paper Corp.,* 892 F. Supp. 1571, 1579 (S.D. Ga. 1995).

> a.    Elliot's October 1997 Transfer to Lead Person on Day Shift

Plaintiff's claim that she was discriminatorily denied the October 1997 transfer to the day

shift lead position which Elliot received fails because plaintiff cannot establish that similarly

situated employees outside of her class were treated more favorably. "In determining whether

similarly situated qualified employees were more favorably treated than plaintiff within this

dynamic, the existence and adequacy of comparators is crucial." *Clermont,* 2001 WL 273144 at

*5 (citing *Marshall v. Western Grain Co., Inc.,* 838 F.2d 1165, 1168 (11th Cir. ), *cert. den.,* 488

U.S. 852 (1988)). Plaintiff has not shown a similarly situated employee who was treated more

favorably. At the time Elliot began working the day shift, plaintiff had only been a lead on the

night shift for approximately one week. (*See* DX 1 at 92-93, 96-100.) Even plaintiff

acknowledged that employees being trained as leads stayed on the night shift for two weeks to

three months. (*See* DX 1 at 113, 136-37.) Thus, plaintiff cannot establish that similarly situated employees outside plaintiff's protected class were treated more favorably.[19]

Furthermore, plaintiff cannot establish that she was qualified for the position. Jones told plaintiff that defendant made the decision to transfer Elliot from the night shift lead person position to the day shift lead person position prior to plaintiff becoming a lead person. (DX 1 at 100-02.) If plaintiff was not a lead on the night shift at the time defendant made the selection for the position, she was not qualified for such position. Moreover, even if defendant made the decision one week after plaintiff became a lead, she still would not have been qualified for the position. Plaintiff acknowledged that employees being trained as leads normally stayed on the night shift for at least two weeks. (*See* DX 1 at 113, 136-37.) The evidence before the court establishes that Jimmy Dean's policy was to fill vacant day shift lead person positions with lead persons from the night shift who had been trained and wanted to transfer to day shift. (DX 1 at 85-86, 90, 167-68; DX 2 at 10-11, 35.) At the time Jimmy Dean made the decision to transfer Elliot to the day shift lead person position, plaintiff had little or no experience in a lead position, whereas Elliot had been trained on two different lines on the night shift. (*See* DX 1 at 92-93, 97-98.) Because plaintiff has failed to show that she was qualified for the position, she cannot establish a prima facie case of race or sex discrimination.

Even if plaintiff had established a prima facie case, her claim would still fail. Defendant has articulated a legitimate nondiscriminatory reason for Elliot's transfer in that he was transferred in accordance with defendant's policy regarding the filling of day shift lead positions and he was more qualified. (*See* Def.'s Br. at 17; *see also* DX 1 at 85-86, 90, 167-68; DX 2 at 31-32, 39.) Plaintiff has not met her burden of raising a genuine issue of fact with respect to the

---

[19] Further, if the decision regarding Elliot's transfer was made prior to plaintiff becoming a lead on the night shift, then there was no vacant position to which plaintiff could transfer.

legitimacy of defendant's articulated reason for its decision.  In fact, plaintiff has failed to offer

any evidence rebutting defendant's reasons for the selection.

As noted above, the evidence before the court demonstrates that, in order to become lead

on the day shift, an employee first had to be trained as a lead on the night shift.  (DX 1 at 85-86,

90, 167-68; DX 2 at 10-11, 35.)  The evidence further demonstrates that, at the time Elliot was

transferred to the day shift, he had been receiving training in a number of positions on the night

shift, whereas plaintiff had only been in training on the night shift for a week.  (*See* DX at 93, 96-

98.)  Plaintiff has failed to present any evidence establishing pretext.  Thus, there is not sufficient

evidence upon which a reasonable juror could infer that plaintiff was discriminated against based

on her race, and defendant is entitled to judgment as a matter of law as to this claim as well.

b.  Transfer to the Day Shift in April 1998

Plaintiff alleges:

After working for six months on the night shift, I was advised by the human
resources manager that two of the three lead positions were filled and the third
position would not be filled at this time.  Further, if I wanted to transfer to the day
shift I would have to take a cut in pay and accept a[n] hourly wage position.  As a
single person I was forced to give up a higher paying position in order to care for
my child.

(DX 1 at Ex. 2 attached thereto.)  Plaintiff also testified that she felt like she was forced to

transfer.  (*See* DX 1 at 128.)

Plaintiff has not established a prima facie case as to this claim as there is no evidence

before the court that defendant subjected her to an adverse employment action.  The evidence

establishes that, in April 1998, plaintiff informed Jones, defendant's Human Resources Manager,

that she wanted to return to the day shift.  (*See* DX 1 at 119, 127.)  Jones informed plaintiff that

in order for her to return to the day shift, she would have do so as an hourly production worker

where there was a vacancy, rather than as a day shift lead person for which there was no vacancy

at that time. (*Id.* at 127-29.) Jones did not force her to return to the day shift or to resign her lead person position. (*Id.*) Plaintiff admitted in her deposition testimony that she could have retained her lead person position on the night shift. (*Id.*) However, plaintiff chose to return to the day shift, and this change in job position was purely voluntary. A voluntary transfer is not an adverse employment action. *See Doe v. DeKalb County School District,* 145 F.3d 1441, 1454 (11th Cir. 1998). Thus, Jimmy Dean did not subject plaintiff to an adverse employment action.

Moreover, there is no evidence that plaintiff was treated differently than similarly situated employees not in her protected class. To the contrary, plaintiff was treated exactly the same as a similarly-situated white male, i.e., Dominic Lee ("Lee"). Like plaintiff, Lee became a lead person on the night shift in 1997. (DX 1 at 139; DX 3 at ¶ 6.) Like plaintiff, he wanted to return to the day shift to care for his child. (DX 3 at ¶ 6.) As no day shift lead positions were vacant at that time, however, he was unable to transfer into a lead person position on the day shift. (*Id.*) He, like plaintiff, resigned his night shift lead person position to be able to return to the day shift even though it meant he had to return to an hourly production worker position. (*Id.* and Ex. F attached thereto.) In fact, Lee returned to the day shift the same day as did plaintiff, April 20, 1998. (*Id.*) Because plaintiff was treated exactly the same as a similarly-situated white male, she cannot establish a prima facie case as to this claim. *See Jones v. Bessemer Carraway Medical Center,* 137 F.3d 1306, 1310-13 (11th Cir. 1998), *opinion modified,* 151 F.3d 1321 (1998). Thus, defendant is entitled to judgment as a matter of law as to this claim as well.

## V. **CONCLUSION**

For the foregoing reasons, the court is of the opinion that Defendant's Motion for Summary Judgment and Defendant's Motion to Strike Plaintiff's Untimely Response to

Defendant's Summary Judgment Motion are due to be granted.  An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this 3⁴ day of May, 2001.

Sharon Lovelace Blackburn

**SHARON LOVELACE BLACKBURN**
United States District Judge